CATHERINE LEAHY *et al.*, Appellants, *vs.* KERMIT J. MURRAY *et al.*, Appellees.

*Opinion filed March 20, 1959—Rehearing denied May 19, 1959.*

GEORGE E. DRACH, and WILLIAM P. ROBERTS, both of Springfield, for appellants.

CHAPIN & CHAPIN, of Springfield, for appellees Agnes Murray *et al.;* SORLING, CATRON AND HARDIN, of Springfield, (GEORGE WILLIAM CULLEN, of counsel,) for appellees Nicholas T. Woloshyn *et al.;* BARBER & BARBER, of Springfield, (CLAYTON J. BARBER, and ALTON G. HALL, of counsel,) for appellee and cross-appellant Charles A. Slivka; and WALTER F. FARRAND, of Springfield, guardian *ad litem,* for appellees Kenneth James Murray *et al.*

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

This is an action commenced in the circuit court of Sangamon County by certain heirs of Alice Murray, Sr.,

deceased, to construe her will, to partition a 90-acre tract of real estate located in Sangamon County in which she had a one-third interest, and for an accounting. Some 40 others, being kindred of the decedent, were named as parties defendant together with Charles A. Slivka, a contract purchaser of the premises. Answers and counterclaims were filed by the various parties in interest which placed in issue not only the will construction and partition problems but also the interpretation of a purchase contract not signed by all the heirs, the question as to who should be bound thereunder, and whether the contract could be specifically enforced by the vendee. The cause was referred to a master in chancery who found that certain defendants, namely Agnes Murray and Harold Murray, had by inheritance acquired a substantial portion of the property interest owned by Alice Murray, Sr., that they were not bound by the real-estate contract executed by other parties in interest, and that the vendee, Charles A. Slivka, should account to them for rents and profits realized from the premises since he took possession in 1948. A decree of partition was subsequently entered in accordance with the master's recommendations which expressly found that no just reason existed for delaying an appeal thereon, and a freehold being involved, direct appeal has been taken to this court by the plaintiffs and the contract vendee.

At the time of her death in 1914, Alice Murray, Sr., owned an undivided one-third fee-simple interest, and her children, Alice Murray, Jr., Margaret Foley, and Michael J. Murray, owned an undivided two-thirds interest, in the north half of the northwest quarter and a part of the northeast quarter of section 19, township 15 north, range 5 west of the third principal meridian, Sangamon County, Illinois. The will of the said Alice Murray, Sr., devised her interest as follows:

"Second: I give and devise to my daughter Alice Murray a life estate in my Real Estate with remainder over in fee to Michael

J. Murray and John J. Murray my sons, and Margaret Foley, my daughter, in equal parts provided that if either said Michael, John or Margaret shall die before said Alice—the life tenant—the share (one-third) devised to such as shall die shall be taken in equal parts by the said survivors."

Margaret Foley departed this life intestate on August 20, 1932, leaving surviving her husband, James Foley, and her children, Catherine Leahy, James Foley, Alice O'Brien, Edward Foley, and Charles Foley. The husband has since died leaving the children as his heirs; Edward Foley passed away on February 20, 1933, leaving his wife, Opal Foley, as his only heir; and Catherine Leahy died during the pendency of these proceedings leaving her husband, Joseph J. Leahy, and three daughters surviving. The children of Margaret Foley, being Catherine Leahy, James Foley, Alice O'Brien, and Charles Foley, together with the said Joseph J. Leahy, are the plaintiffs-appellants in this cause.

Michael J. Murray conveyed his interest in the subject property to Alice Murray, Jr., on September 22, 1920, and subsequently passed away on June 18, 1937, intestate, leaving his wife, Elizabeth Murray, and his children, Kermit J. Murray, Thomas Murray, James Murray, and Geraldine Murray, all defendants herein, as his surviving heirs.

John J. Murray, the last living remainderman, died intestate on May 5, 1941, with his wife, Agnes Murray, and his sons, Clement J. Murray and Harold Murray as his only heirs-at-law. Clement J. Murray passed away intestate on July 24, 1952, leaving his mother and brother surviving. The said Agnes Murray and Harold Murray, defendants, are sometimes referred to as the "heirs of John" and were the prevailing parties in the lower court.

Alice Murray, Jr., the life tenant under the aforesaid will and grantee of Michael J. Murray, departed this life testate on September 20, 1946, devising all her interest therein to Kermit J. Murray, defendant, a son of the said Michael J. Murray. During the pendency of these proceedings, Kermit J. Murray died intestate leaving his wife,

Ann M. Murray, and his minor children, the latter being represented herein by a guardian *ad litem*.

On May 3, 1948, a real-estate contract to sell the 90-acre parcel for $27,000 was executed by Kermit J. Murray and Catherine M. Leahy, as vendors, and Charles A. Slivka, as vendee, under which $2,500 of the purchase money was placed in escrow pending the closing of the transaction, with the balance to be paid on or before September 1, 1948, upon receipt of a warranty deed conveying mechantable title. The contract also stated that the sale was subject only to the lien of the 1948 taxes and the rights of the year-to-year tenant in possession, that the vendee should receive the landlord's share of the 1948 crops and could at any time remove the farm buildings from the premises, and contained the usual covenants concerning abstract of title, insurance, and so forth. No provision was made for the payment of interest on the unpaid balance of the purchase price. Upon examining the abstract of title, the vendee discovered that the vendors did not own the entire fee and reported this fact in writing to the vendors on May 18, 1948. Thereafter, the vendee notified the tenant that he was the property owner and proceeded to collect rents and manage the property as his own. On September 2, 1948, being the day after the transaction was to have been closed, the vendee informed the vendors by letter that he was ready and willing to complete his part of the bargain, and since that time has kept the cash sum of $24,500 uninvested and available for immediate payment. Although there is a dispute as to the quantity, it is agreed that Agnes Murray and Harold Murray own an undivided interest in the premises, and since they have refused to join in the deed, the vendors have been unable to convey mechantable title. The plaintiffs James Foley, Alice O'Brien, and Charles Foley, although not parties to the original agreement, have since ratified the contract so as to be bound thereby.

Many contentions have been advanced by the various parties to this proceeding. The plaintiffs argue that under the will of Alice Murray, Sr., a life estate was created in favor of Alice Murray, Jr., with an equal remainder interest vesting in Michael J. Murray, John J. Murray, and Margaret Foley at the testator's death, each remainder interest being subject however to divestiture (1) by the death of its owner prior to that of the life tenant *plus* (2) the survival of the life tenant by at least one remainderman. Since no remainderman survived Alice Murray, Jr., they contend that no divestiture occurred and the interests of Margaret, Michael, and John passed to the heirs and assigns of each, freed from such conditions, so as to now vest equally in the plaintiffs, as heirs of Margaret, in Kermit J. Murray, as the devisee of Alice Murray, Jr., the grantee of Michael, and in Agnes Murray and Harold Murray, the "heirs of John," respectively. The plaintiffs also urge that even though the "heirs of John" did not execute the sales contract, by their acts and acquiescence they became bound by its terms on the principles of estoppel and ratification. As to the vendee, they insist he should be required to pay interest on the purchase price during the time he received the rentals from the premises.

On the other hand, the "heirs of John" interpret the will as creating vested remainders in each of the three named children with divestiture in favor of the survivors upon the death of a remainderman before the life tenant. They argue that such divestiture applies only to the remainder interest acquired under the will and not to any interest acquired as a survivor, and that upon the death of two remaindermen, the interests of John J. Murray became absolute without regard to when he died. Therefore, as they see it, upon the death of Margaret, her interest passed equally to Alice Murray, Jr., and John, the former having previously acquired Michael's interest. When Michael

died, his original interest passed to John but the portion which was acquired as a survivor of Margaret remained vested in Alice Murray, Jr. Finally, upon John's death, his original interest plus the interests which he had acquired as the survivor of both Margaret and Michael, passed to his heirs in fee simple. These defendants also deny that they have in any manner become bound by the contract.

The vendee, Charles A. Slivka, contends that the life tenant must be included within the term "survivors," and that since she outlived the remaindermen, the bulk of the Alice Murray, Sr., interest passed to her. He also argues that the "heirs of John" are bound by the contract, that he was under no obligation to pay interest on the contract balance, and that the vendors should reimburse him for any rents which he may be forced to pay to the "heirs of John" as a result of these proceedings. The guardian *ad litem* for the minor children of Kermit J. Murray insists the the vendee has not complied with the contract provisions so as to warrant specific performance.

Admittedly, all remainder interests initially vested upon the testator's death. (See *Fleshner* v. *Fleshner*, 378 Ill. 536). Therefore we are concerned only with the divestiture effect of the will provisions. The second paragraph thereof expressly created a life estate "with remainder over in fee to Michael J. Murray and John J. Murray, my sons, and Margaret Foley, my daughter in equal parts." If no more had been said, it is evident that each of these children would have acquired an absolute undivided fee-simple interest upon the testator's death which would have thereafter passed to their respective heirs or assigns regardless of when the remainderman's death occurred. However, the will goes on to state that "if either said Michael, John or Margaret shall die before said Alice—the life tenant—the share (one-third) devised to such as shall die shall be taken in equal parts by the said survivors." Clearly, the word "survivors" refers to the enumerated "Michael, John or

Margaret" and was not intended to include Alice, the life tenant, so as to permit her to share in a divested estate. Neither do we interpret this language to mean that divestiture could occur only if at least one remainderman survived the life tenant. To do so would not only place a strained interpretation upon otherwise unambiguous language but, in case a remainderman died before the life tenant, would also postpone the operation of the divestiture conditions until it could be determined whether the holder of the life estate would outlive all the remaindermen. If she did, then according to the plaintiff's theory no divestiture would have occurred, but if she did not, then her death would have the retroactive effect of activating an otherwise dormant executory devise. Such abeyances of title are not to be encouraged. (19 Am. Jur., Estates, sec. 14.) By devising the remainder interests to three of her children, and to the survivors thereof should either die before the life tenant, the testator indicated that she intended to benefit these three children to the exclusion of her other two children and her grandchildren. In other words she wanted the property to go to Michael, John, and Margaret, and if death of either occurred within the time specified, she desired that the surviving children, not the heirs of the deceased child, should take. Nothing more could have been accomplished by requiring that the "survivors" not only outlive the deceased child, but also the life tenant who had no interest whatsoever in remainder. We construe the will to mean that upon the death of a remainderman, that original one-third interest passed to the surviving remaindermen.

Thus, when Margaret Foley died in 1932, her one-third share of her mother's interest passed in equal parts to Alice Murray, Jr., the grantee of Michael, and to John. At that point Alice owned Michael's one-third share plus Margaret's one-sixth, and John owned his original one-third share and Margaret's one-sixth. Upon Michael's death in 1937, his one-third share which had been assigned to Alice of course

passed to John as the survivor. However, the one-sixth interest also held by Alice as a result of Margaret's prior death did not so pass but was the absolute property of Alice without conditions of divestiture. The rule is that in the absence of a contrary intent on the part of the testator, a gift over to survivors is not to be construed as embracing resurvivorship of a share which has once passed to a survivor, but that such accrued share immediately becomes the absolute property of such recipient without regard to whether he himself may leave survivors. (166 A.L.R., pp. 1278, 1299, 1301; *Boggs* v. *Boggs,* 69 N. J. Eq. 497, 60 Atl. 1114.) In the present case there certainly was no contrary intent since the will expressly provided that only "the share (one-third) devised to such as shall die" should pass to the survivors. This, of course, would not include the accrued shares. Therefore, following Michael's death, Alice held one-sixth of the remainder and John five-sixths. He being the last of the remaindermen, when John died in 1941 there was no "survivor" and under such circumstances we have previously held that unless the testator clearly provided to the contrary, the conditions of divestiture which would here have normally divested the original one-third do not apply. (*Burkholder* v. *Burkholder,* 412 Ill. 535; *McGlothlin* v. *McElvain,* 407 Ill. 142.) For example, in the last cited case a testator left particular properties to each of his seven children but provided that should any such child die without issue, that share would pass to the testator's surviving children. Although Rachel Plowman, the last of the seven children, died without issue, we held that divestiture would have taken place only if the child had died without issue and there had been a brother or sister surviving. Since the latter condition was not met, we were of the opinion that the divesting clause was inoperative as to the last surviving child and that Rachel Plowman could dispose of this interest by her will. In the present case the same test must be applied so as to allow a

divestiture only if a remainderman (1) died prior to the life tenant and (2) left another remainderman surviving. Although John died during Alice's lifetime, he left no remainderman surviving so as to create a divesting of his original one-third share. Since, as we have previously stated, the accrued shares were not subject to divestiture, we hold that upon John's death his five-sixths interest passed to his heirs. It must be remembered that although we have spoken of either one-third, one-sixth or five-sixths fractional interests, these refer to those proportional parts of the undivided one-third interest in the 90-acre tract held by Alice Murray, Sr., at her death, and do not represent those enumerated fractions of the entire property.

As to the contract itself, it is admitted that neither Agnes Murray nor Harold Murray, the "heirs of John," executed the written instrument. Therefore, since a sale of real estate was involved, they were not bound thereon unless they had by their own acts authorized the vendors to act as their agents, ratified the agreement, or estopped themselves from denying its validity. (Ill. Rev. Stat. 1947, chap. 59, par. 2; *Mitchell* v. *Art Institute of Chicago,* 269 Ill. 381.) We must examine the record in this regard. Kermit J. Murray testified that at a conference held in the judge's chambers at Virginia, Illinois, when the will of Alice Murray, Sr., was being probated on January 10, 1947, at which time Catherine Leahy, Joseph Leahy, Harold Murray, Clement Murray, the witness, and certain attorneys were present, Clement Murray said that "anything we done about disposing of the farm would be okay with them," and Harold Murray added, "Yes, because we need the money bad." This witness stated that he later talked to Harold Murray by telephone and offered to go to St. Louis to discuss the farm sale "and see if we could not agree," but Harold replied that "there was no use bothering, he did not care to talk about it." After the contract was executed in May, 1948, a conference was had among Catherine

Leahy, Harold Murray, the witness, and their attorneys on August 26, 1948, for the purpose of discussing the Slivka sale and convincing the "heirs of John" that they should sign a settlement agreement which had previously been prepared and which would have limited their interest in the Alice Murray, Sr., property to a one-third share. At that time Harold was informed that the property had been sold for $27,000, and thereafter, Kermit J. Murray again called Harold and told him "we would like awful well to get this thing settled." The witness even offered to drive to St. Louis to see if he "couldn't work out something some way or another on selling the property and get the money in escrow, where we would at least have our price out of the farm," but without success. Kermit J. Murray admitted that he had never seen or talked with Agnes Murray during his life and that he had received no correspondence from any of the "heirs of John" during the years 1947 and 1948.

Joseph J. Leahy also testified as to the Virginia conference. According to him, Clement Murray then said that whatever was done in disposing of the farm was alright with him, and Harold Murray "just shook his head and acknowledged like it was okay. He didn't speak out at the time."

James J. Graham, attorney for the vendors, told of the conference in his office on August 26, 1948. As he remembered Clement and Harold Murray were present and "it was agreed all around  *  *  *  that the sale was approved, but there was a difference of opinion on the part of Clement and Harold Murray what the division or their distributive share would be." It was his understanding that the "heirs of John" had approved the sale although there was still a dispute as to their distributive share, but he admitted upon cross-examination that he had nothing in his file from either of them authorizing the sale.

Creel Douglas, attorney for Kermit J. Murray, recalled that the August 26 meeting was largely called to settle the

matter of distributive shares although the Slivka contract was mentioned. As to the Virginia conference he said: "I don't recall anything being mentioned in the presence of Clement Murray and Harold Murray with reference to the sale of the ninety-acre farm involved in the proceeding, except it was mentioned there was real property, and there would be a possibility of disposing of it."

Alice O'Brien, one of the plaintiffs, told of discussing the proposed sale with the vendors and of delivering the settlement agreement to Clement Murray at St. Louis in August, 1948, for his, his brother's and Agnes Murray's signatures, but such was never completed. In explaining why she requested these signatures, she went on to say "naturally, if you have a contract, if you sold a piece of property and there were other heirs involved, you would certainly have to get the signature before you could complete the sale," and "I understood that Catherine Leahy and Kermit Murray had signed the contract, and that the contract had to be signed by all the other heirs."

Harold Murray denied that he or the other "heirs of John" had authorized or approved of such sale. According to his account, he had known of certain offers of sale which were made to the vendors but he did not know the terms thereof or that the Slivka contract had in fact been signed until some time later, and at the August 26 meeting the proposed settlement agreement was discussed but later turned down by the "heirs of John." It was his thought that no authorization for sale was to be given until all problems, including the distributive shares, were worked out among the parties. As to Clement, who died in 1952, two letters were introduced by the plaintiffs to show his authorization of sale. The first was written in October, 1947, and in reference to the farm said "Yes, that is a nice price for the farm." The other letter, dated May 12, 1948, stated that Clement was writing "to see if we can't get something done about the farm" and that he was on the

Foley's side in any stand that could be taken to speed things up. Other exhibits included a letter written by the vendors' attorney to Joseph Simpson, attorney for "heirs of John," on November 10, 1948, which inquired as to the progress which was being made "with reference to the agreement among the heirs of Alice Murray." A return letter from Simpson stated that the "heirs of John" would agree to sell the farm if they were paid $6,500 for their interest. On December 20, 1948, the vendors' attorney again wrote to Simpson asking him if his clients would execute a deed to the premises and allow the court to distribute the proceeds. The return letter of January 19, 1949, informed the vendors' attorney that the "heirs of John" were unwilling to consent to the sale or to sign any agreements for the distribution of proceeds unless they were assured of a one-third interest therein.

We cannot, upon these facts, hold that either of the "heirs of John" have in any manner become bound upon the sales contract. They did not sign the instrument itself or give any written authorization for the vendors to sign in their behalf so as to satisfy the Statute of Frauds, (Ill. Rev. Stat. 1947,, chap. 59, par. 2,) nor did they thereafter ratify the contract in writing so as to be bound to its terms as principals. (*Nehrkorn* v. *Tissier,* 352 Ill. 181.) Even if we were to find some authority to sell, there is no showing whatsoever that the "heirs of John" had sufficient prior knowledge of the terms of sale to even authorize someone to act in their behalf. (*Jones* v. *Howard,* 234 Ill. 404; *Leach* v. *Hazel,* 398 Ill. 33; *Butman* v. *Butman,* 213 Ill. 104.) Considering the record as a whole, the most that can be said is that at the Virginia conference in January, 1947, Harold and Clement Murray expressed a desire to sell the farm and indicated their willingness to consider any plan for its disposition, and at the August, 1948, conference they were agreeable to carrying out the Slivka contract provided there could be an agreement as to their

distributive share. Such is indicated by the correspondence between the attorneys, by Kermit J. Murray's telephone conversations with Harold Murray, by the testimony of Creel Douglas concerning the August 26 and the Virginia meetings, by Alice O'Brien's understanding that all the heirs had to sign the contract, and by the preparation of a settlement agreement some three months after the property had been sold. Although estoppel may be asserted in a proper case, it should be applied to defeat real-estate titles only upon clear and satisfactory proof, since to do otherwise would contradict our Statute of Frauds and tend to the insecurity of property titles. Here there is no such satisfactory evidence of fraudulent and inequitable action as to warrant invoking this principal. (*Bondy* v. *Samuels,* 333 Ill. 535; 19 Am. Jur., Estoppel, sec. 87.) Certainly, Slivka has no grounds to assert such a defense since he had no dealings with the "heirs of John" and did not even know of their interest until after the contract was signed. The vendors themselves only spoke with Harold and Clement Murray on one occasion prior to the date of sale and this was for a few minutes in a judge's chambers while their grandmother's will was being probated. Although there were some discussions between the parties subsequent to sale, we fail to see how this was in any manner detrimental to the vendors since their liability had already attached. Furthermore, it must be noted that at no time did Agnes Murray take part in any such discussions or conferences. It may well be that the vendors honestly felt that they were acting for the benefit of all concerned and that the "heirs of John" would have no objection to the sale, but under the circumstances of this case, it cannot be said that such belief was legally justified. Therefore, the "heirs of John" are not bound by the sales agreement.

Although the contrary has been urged by the guardian *ad litem* herein, we are of the opinion that the vendee is not precluded from enforcing the contract against the par-

ties bound thereunder so as to demand either a conveyance of their interests with an abatement of the purchase price in proportion to the shares held by the "heirs of John," or to recover damages as a result of their failure to furnish merchantable title as agreed. Neither did the lower court err in refusing to require the payment of interest by the vendee on the contract balance or in denying reimbursement to the vendee from the vendors for that portion of the farm rentals which he will hereafter be required to pay to the "heirs of John." Such matters are largely discretionary with a court of equity and its decision therein will be set aside only where such is clearly erroneous. (*Mitchell v. Art Institute of Chicago*, 269 Ill. 381; *Butman v. Butman*, 213 Ill. 104; 55 Am. Jur., Vendor and Purchaser, sec. 347.) The contract not only provided for immediate possession without payment of interest, but also the full purchase price of $27,000 was at all times kept uninvested and available for immediate use. Accordingly, we are of the opinion that the lower court's discretion has not been abused.

We have carefully considered the many objections which were raised by this appeal and find each to be without merit. Therefore, for the reasons stated herein, the decree of the circuit court of Sangamon County is affirmed.

*Decree affirmed.*